[Civil No. 3649. Filed June 7, 1935.]

[45 Pac. (2d) 955.]

# A. W. CRANE, Petitioner, v. ANA FROHMILLER, as State Auditor, Respondent.

Mr. Emmet M. Barry, for Petitioner.

Mr. John L. Sullivan, Attorney General, and Mr. Dudley W. Windes, Assistant Attorney General, for Respondent.

Mr. Terrence A. Carson, *Amicus Curiae.*

LOCKWOOD, C. J.—A. W. Crane, hereinafter called petitioner, filed an original proceeding in this court asking for a writ of *mandamus* against Ana Frohmiller, as auditor of the state of Arizona, hereinafter called respondent, to compel her to pay two claims against the state, one of which was made by petitioner personally and the other of which was assigned to him by Thomas A. Flynn. Respondent demurred to the petition, and the matter is before us upon the demurrer.

An earnest request was made to this court by counsel for both petitioner and respondent that we take up this case out of its regular order and consider it immediately; it being asserted that vital interests of the state were involved therein and that its rights would be greatly prejudiced if a prompt decision of the points involved was not had. It was represented to us by the state tax commission and the Attorney General that there are suits now pending in the federal courts involving many million dollars of taxes; that the state of Arizona is the real defendant in such actions; that plaintiffs are pressing the cases for trial, and, in order that the state might properly present its defense, an immediate determination of the questions herein was imperative. For this reason we have laid aside all pending matters and devoted ourselves to a consideration of the case.

The precise legal question before us is whether upon the facts stated in the petition it is the imperative duty of respondent to approve the claims presented. We therefore summarize its allegations as follows: On the 7th day of January, 1935, which was the date for the convening of the regular session of the Twelfth Legislature, there were pending in the District Court of the United States ten suits, in which various corporations were plaintiffs and the state tax commission, representing the interests of the state,

was defendant, contesting tax assessments on the properties of the plaintiffs for the years 1933 and 1934. There were also pending in the superior courts of the state two suits wherein certain other corporations were contesting the assessments of their property for the year 1934. On the 21st of January six of these suits in the district court, filed by one of the corporations, were dismissed without prejudice, and immediately thereafter three new suits were filed by such corporation, contesting the same assessments which were contested in the six suits dismissed. While the Twelfth Legislature was in session, and while all these suits were pending, the Attorney General of the state of Arizona was summoned to appear before a joint session of the Appropriation Committee of the Senate and House for the purpose of determining what provision should be made by the legislature to provide funds for the defense of the suits. In response to this request, the Attorney General did appear and advised the legislature that he could not determine what moneys would be necessary to make a defense to the suits and asked it to make such provisions as it deemed necessary to meet the situation. Various members of the legislature and the Governor discussed the matter, and, after considering what they believed to be the various available remedies, and particularly the provisions of chapter 61 of the Session Laws of 1931, the Governor advised the legislature that he thought that he could take care of the situation without the necessity of any new legislation. The Attorney General, however, was not satisfied with this, and informed the legislature that he thought an additional appropriation for the purpose of assisting in the defense of such suits was necessary, and in pursuance of this request there was included in the gen-

eral appropriation bill of 1935 the following provision:

"Subdivision 33. Governor's Tax Litigation Fund.
 For the 24th Fiscal Year
 For the 25th Fiscal Year
 Tax Suits......$10,000.00

"There is hereby appropriated to the Governor's General Fund the sum of $10,000.00 or so much thereof as may be necessary for the prosecution, defense or settlement of pending tax litigations. Said sum to be used and expended in conjunction with the Attorney General's Office. This appropriation shall be exempt from the provisions of the Financial Code and any balance remaining at the end of the fiscal year shall not revert to the general fund."

About the 21st of March, 1935, and after all the things above set forth had happened, the legislature adjourned. Thereafter negotiations were entered into for a compromise of the two suits pending in the superior courts of the state, and they were duly settled without expense to the state. It was impossible to settle certain of the suits pending in the federal courts, and on the 25th day of April the Attorney General and the tax commission, being satisfied that those cases would have to be tried upon their merits, requested the Governor to authorize the tax commission to incur debts and liabilities against the state to the amount of $25,000, under chapter 61, *supra,* for the purpose of defending these suits. In accordance with such request, the Governor, after reciting the facts in regard to the litigation involved, on April 29th by a proclamation stated as follows:

"Now, therefore, I, B. B. Moeur, Governor of the State of Arizona, in accordance with the act herein named, declare and proclaim the fact that the Tax Commission is authorized to incur debts and liabilities against the State of Arizona in defense of said suits herein named in the sum of Twenty-five Thousand ($25,000.00) Dollars, or such amount thereof as

may be necessary, to be paid as other claims against the State, from the General Fund."

Shortly thereafter the federal court ordered defendant to answer in certain of the suits aforesaid, and the state tax commission employed Thomas A. Flynn as special counsel, at the rate of $50 per day, who assisted the Attorney General's office to prepare the answers in those cases. It also became necessary to gather evidence in support of the answers, and the commission employed experts for the preparation thereof, among whom was petitioner herein; the compensation of the latter being fixed at the rate of $20 per day. Petitioner and Flynn each performed one day's service under the employment above set forth, and then filed claims against the state of Arizona for such services, based on the provisions of the Governor's proclamation, as aforesaid, which were duly approved by the tax commission, and by it presented to the respondent for her approval as auditor. She refused to give this approval, for the reason that in her opinion the Governor's proclamation authorizing the incurring of liability by the tax commission to the extent of $25,-000, as above set forth, was invalid, whereupon this petition was filed.

The question before us is whether on this state of facts it is the duty of the auditor to approve the claims in question. Section 5 of article 9 of the Constitution of Arizona reads in part as follows:

" . . . No money shall be paid out of the State treasury, except in the manner provided by law."

Provisions of this nature appear in many state constitutions, and they have universally been interpreted to mean that the people's money may not be expended without their consent either as expressed in the organic law of the state or by constitutional

acts of the legislature appropriating such money for a specified purpose. *Dickenson* v. *Clibourn,* 125 Ark. 101–105, 187 S. W. 909; *People* v. *Goodykoontz,* 22 Colo. 507, 45 Pac. 414; *State* v. *Burdick,* 4 Wyo. 272, 33 Pac. 125, 24 L. R. A. 266. The rule is so well known and so generally accepted that no further citations are needed to support it.

 There can be no contention that the Constitution itself authorizes the payment of the claims in question from the state treasury, and we therefore turn to the statutes to see whether the legislature has affirmatively and constitutionally given such authorization. It is generally held that the legislature is supreme in matters relating to appropriations, except so far as there are constitutional restrictions upon it. *LeFebvre* v. *Callaghan,* 33 Ariz. 197, 263 Pac. 589; *People* v. *Pacheco,* 27 Cal. 175; *Graham* v. *Childers,* 114 Okl. 38, 241 Pac. 178; *State* v. *Zimmerman,* 183 Wis. 132, 197 N. W. 823. And an appropriation need not be made in any particular form of words nor in express terms; all that is required being a clear expression of the legislative will on the subject. *Proll* v. *Dunn,* 80 Cal. 220, 22 Pac. 143; *Davis* v. *People,* 78 Colo. 521, 242 Pac. 995, 996. But there are two limitations, not as a rule expressed in precise language in the various state Constitutions, but nevertheless almost universally upheld, as implied therein. The first is that the legislature may not delegate its power to make laws to any other person or body, except when authorized by the Constitution. *Schechter Poultry Co. et al.* v. *United States,* 295 U. S. 495, 55 Sup. Ct. 837, just decided; *Board of Harbor Commissioners of Port of Eureka* v. *Excelsior Redwood Co.,* 88 Cal. 491, 26 Pac. 375, 22 Am. St. Rep. 321; *State* v. *Keener,* 78 Kan. 649, 97 Pac. 860, 19 L. R. A. (N. S.) 615; *State* v. *Thompson,* 149 Wis. 488, 137 N. W. 20, Ann. Cas. 1913C 774, 43

L. R. A. (N. S.) 339; 6 R. C. L., p. 164. It therefore must itself make any appropriation which authorizes money to be drawn from the state treasury, and it cannot delegate that power to another. The second limitation is that, when a legislative appropriation is directed to be paid out of the general fund, but not to comprise the whole of such fund, the appropriation must be specific as to a maximum amount and cannot be left indefinite and uncertain in this regard. In the case of *Tillotson* v. *Frohmiller*, 34 Ariz. 394, 271 Pac. 867, 871, we had this last limitation before us. Therein we quoted approvingly from the case of *State ex rel. Davis* v. *Eggers,* 29 Nev. 469, 91 Pac. 819, 16 L. R. A. (N. S.) 630, as follows: ''As all appropriations must be within the legislative will, it is essential to have the amount of the appropriation, or the maximum sum from which the expenses could be paid, stated. This legislative power cannot be delegated nor left to the recipient to command from the state treasury sums to any unlimited amount for which he might file claims. True, the exact amount of these expenses cannot be ascertained nor fixed by the legislature when they have not yet been incurred; but it is usual and necessary to fix a maximum, either in the general appropriation bill or in the act authorizing them specifying the amount above which they cannot be allowed,'' and we referred to the cases of *Blaine County Inv. Co.* v. *Gallet,* 35 Idaho 102, 204 Pac. 1066, and *Peabody* v. *Russell,* 302 Ill. 111, 134 N. E. 150, 20 A. L. R. 972, as stating the same rule.

A similar question arose in the state of California, and the Supreme Court of that state in the case of *Ingram* v. *Colgan,* 106 Cal. 113, 38 Pac. 315, 39 Pac. 437, 438, 46 Am. St. Rep. 221, 28 L. R. A. 187, said as follows:

" . . . The fund from which the bounties are to be paid is explicitly designated, but the amount of money in the general fund devoted to the payment of these bounties is not specified. The language lacks the first essential to an efficient appropriation. There is no designated amount, and consequently there is no 'specific appropriation' to be exhausted, unless it can be said that the whole general fund is set aside as a specific appropriation to the end in view,—a proposition not seriously to be considered. *Redding* v. *Bell*, 4 Cal. 333. It is freely conceded that the use of technical words in a statute is not necessary to create an appropriation. But, while no set form of language is requisite, upon the other hand there are some things which plainly enough are not severally an appropriation. A promise by the government to pay money is not an appropriation. A duty on the part of the legislature to make an appropriation is not such. A promise to make an appropriation is not an appropriation. Usage of paying money in the absence of an appropriation cannot make an appropriation for future payment. *Ristine* v. *State*, 20 Ind. [328], 333. The utmost that can be claimed for the act under consideration is that it pledges the good faith of the state to the making of an appropriation. Herein the language of the supreme court of Colorado, in *Institute for Education of Mute & Blind* v. *Henderson*, 18 Colo. 105, 31 Pac. 714 [18 L. R. A. 398], is peculiarly apposite: 'To permit the disbursement of an indefinite amount of money, as these bounty acts contemplate, is to introduce an element of uncertainty into these calculations that will seriously embarrass both the legislature and the departments in giving effect to our state constitution with relation to the levying of taxes to meet appropriations. If the legislature desires to pay bounties, it may do so for all proper purposes by making the necessary appropriations therefor. Thus the public funds of the state will be protected, and the safeguards provided by the vigilance of the framers of our fundamental law will be given a construction best calculated to prevent the evils aimed at.' . . . "

The general rules governing appropriations by legislatures are exhaustively discussed in *Ristine* v. *State,* 20 Ind. 328, and the same principle is upheld, as it is also in *People* v. *Kenehan,* 55 Colo. 589, 136 Pac. 1033, *State* v. *Holmes,* 19 N. D. 286, 123 N. W. 884, and *In re Opinion of Judges,* 48 S. D. 253, 203 N. W. 462. It is true there are a few decisions to the contrary, such as *State* v. *Zimmerman,* 183 Wis. 132, 197 N. W. 823, and *State* v. *Henderson,* 199 Ala. 244, 74 So. 344, L. R. A. 1917F 770, but they are contrary to the great weight of authority and to our own holding in *Tillotson* v. *Frohmiller, supra.*

We hold, therefore, that, in order to constitute a valid appropriation by the legislature, it must, if the appropriation is to be paid from the general fund, fix at least a maximum amount beyond which such appropriation may not go, although, if the payment is to be made only from a special fund which is itself limited in amount, no limit need be stated in the act authorizing the expenditures and specifying for what purpose the money is to be expended.

With these general rules to guide us, let us determine whether there is a valid appropriation from which the claims in question may be paid. It is the contention of petitioner that this appropriation is found in chapter 61, Session Laws 1931, which reads as follows:

"An act authorizing the Governor to issue emergency proclamations to cover expenses of tax suits.

"Be It Enacted by the Legislature of the State of Arizona:

"Section 1. In addition to the powers granted to the governor under Section 2620, Revised Code, 1928, the governor when requested by the tax commission and the attorney general, for the purpose of providing funds to defend suits brought against the tax commission contesting tax assessments, may authorize the tax commission to incur debts and liabilities against

the state to be paid as other claims against the state from the general fund.''

Upon examining this act, it is obvious instantly that it does not comply with the rule in regard to a limit of the maximum which can be expended thereunder. There is no limit placed upon the amount of debts or liabilities which may be incurred, and it expressly states that such claims are to be paid from the general fund of the state. For the reasons above stated, if the act be construed as an attempt to give a blank check upon the general fund to the Governor, the tax commission, and the Attorney General, it is unconstitutional, invalid, and of no effect whatsoever. But, says petitioner, even though it may not be valid as a general and unlimited appropriation, it is nevertheless valid as a special emergency appropriation, under the opinion in *LeFebvre* v. *Callaghan, supra,* and it is urged that the act, if so construed, in effect adds a new kind of emergency to those specified in section 2620, Revised Code of 1928. In that case we discussed the meaning of the word ''emergency'' as used in the section just cited. Therein we held that no state of facts upon which the legislature had had the opportunity of acting could, within the meaning of the section, constitute an emergency which would justify the Governor in incurring an indebtedness under its terms. The fact that according to the petition the legislature was mistaken as to the powers of the Governor to take care of the matter without further legislation cannot affect the principle of law involved. When that body knows of the existence of a situation, and when it acts in view thereof, either affirmatively or negatively, no administrative officer may substitute his judgement for that of the legislature at a later time merely because the latter has made a mistake in its action. To so hold would be to delegate to every executive officer the right to sub-

stitute his judgment for that of the legislative authority in what has been held from time immemorial the exclusive and most important prerogative of that body, to wit, the appropriation of public money.

We therefore hold that upon the facts stated in the petition there was no emergency existing within the true meaning of the law at the time the Governor issued his proclamation in May, 1935.

But, even if an emergency did exist, chapter 61, *supra,* cannot be invoked to aid it, for by its terms any claims arising under it are to be paid from the general fund. The legislature, when it adopted section 2620, *supra,* was evidently advised as to the constitutional principles governing appropriations, for it very carefully created a special fund from which alone any indebtedness incurred by virtue of the provisions of the section could be paid, and expressly limited indebtedness to be incurred in excess of that special fund to $350,000. Since chapter 61, *supra,* does not constitute an appropriation, and since there is no other provision of law which would justify the auditor in paying the claims in question, the proclamation of the Governor authorizing the incurring of the indebtedness, as shown by the claims involved herein, would not justify or permit her to approve such claims, and she was only performing her duty when she rejected them, for, even though they be valid claims against the state, which it is morally bound to pay, it is universally held, under a constitution like ours, that the disbursing officers of the state may not pay such claims in the absence of an appropriation therefor.

Section 35, Revised Code of 1928, expressly states the duty of the auditor when a claim is presented to her involving a valid debt of the state for which no appropriation for payment has been made. She is required to issue a certificate of indebtedness, which

can be presented to the legislature at a later date with a request that an appropriation be made for the payment thereof.

We might conclude our opinion at this point, but, in view of the important principles involved, we think it best to state other reasons why one, at least, of the claims is for an indebtedness incurred without authority of law. Chapter 30, Session Laws of 1931, reads in part as follows:

"Sec. 52a. *Legal Advisor of Departments.* The attorney general shall be the legal advisor of all departments of the state, and shall give such legal service as such departments may require. With the exception of the industrial commission, no official, board, commission, or other agency of the state, other than the attorney general, shall employ any attorney or make any expenditure or incur any indebtedness for legal services. The attorney general may, when the business of the state requires, employ assistants."

This is an explicit statement that no official, board, commission or agency of the state, with the exception of the Attorney General, is permitted to incur any indebtedness for legal services, and the latter is required to furnish any such services that may be required by any department of the state. This necessarily includes the state tax commission. The legislature realized, of course, that the Attorney General could not in his own person perform all of the many legal services required in the administration of the government, and expressly authorized him to employ assistants. There is but one limit to this authority, and that is that he may not incur an indebtedness for the services of such assistants in excess of the appropriations made by law for their payment. Chapter 34, Sess. Laws 1931. The petition alleges that the state tax commission employed Thomas A. Flynn to perform legal services for it in the defense of the suits in question. This it was expressly prohibite

by chapter 30, *supra,* from doing, and we know of no later provision of the law which has repealed that chapter. If the tax commission felt the need of a special legal advisor, it was its duty to present the matter to the Attorney General, and it was his discretionary right to employ such assistants as he thought necessary to perform those services, within the limitation of the appropriation made by the legislature for that purpose.

It was earnestly contended by petitioner that, if the proclamation of the Governor authorizing the expenditure of the $25,000, set forth therein, is held to be illegal, the state of Arizona may suffer the loss of many million dollars of taxes. We are of the opinion that petitioner is unduly alarmed as to the results which will flow from our decision. If the Governor, Attorney General and the tax commissioners are honest and capable public officers, as of course we know they are, they have full power and ample means to protect fully the interests of the state in the pending litigation. So far as legal services are concerned, the Attorney General is required by law to furnish them. If for any reason he feels that he is personally unable properly to represent the state in the pending litigation, the legislature has given him unlimited power to choose any competent attorneys as assistants, and has provided in the general appropriation bill a fund of nearly $20,000 per annum which he may, if he desires, use to such extent as may be necessary for the compensation of such assistants. In the case of *Wiggins* v. *Kerby,* 44 Ariz. 418, 38 Pac. (2d) 315, 317, we said:

" . . . When there are charges fixed by general law against an appropriation of this kind, such, for instance, as the salary of the head of an office or department, they should be deducted from the total and the balance used to pay the legal and necessary obli-

gations of the office *as they arise* until the appropriation is exhausted. In planning how the appropriation should be spent he should, of course, use his best efforts to reduce the expenses of administering his office to such a point that the appropriation will cover the cost of all the necessary duties thereof, but in any event the obligations so incurred must be paid from the appropriation *in the order in which they arise,* no matter what effect such action may have in exhausting the appropriation.'' (Italics ours.)

If it be necessary, in order to secure competent legal talent to assist the Attorney General in the discharge of his duties in regard to the pending litigation, to exhaust the appropriation for that purpose, so that other matters arising at a later date, cannot properly be taken care of, he should perform the instant duty with the utmost economy consistent with efficient service, and leave to the proper authorities of the state, to wit, the Governor and the legislature, to determine whether it is necessary at a later time to provide him with additional funds. So much for the legal aspects of the litigation.

It is, of course, important, and at times absolutely necessary, in extended litigation to incur other expenses beside those for strictly legal assistance. The legislature realized this, and made an appropriation of $10,000 by subdivision 33, *supra,* ''for the prosecution, defense or settlement of pending tax litigation.'' Petitioner urges that this appropriation is invalid, for the reason that it violates article 4, part 2, section 20, of the Constitution, in that it embraces more than an appropriation for a department of state; in effect operates to amend section 2614, Revised Code of 1928; attempts to delegate a power of expending money which is not given under any existing law; and gives the Governor power to employ counsel and to incur expenses for legal services, contrary to the provisions of chapter 34, *supra.*

The constitutional provision just cited reads as follows: "Section 20. The general appropriation bill shall embrace nothing but appropriations for the different departments of the State, for State institutions, for public schools, and for interest on the public debt. All other appropriations shall be made by separate bills, each embracing but one subject," and it is urged that in the case of *Sellers* v. *Frohmiller*, 42 Ariz. 239, 24 Pac. (2d) 666, we have held an appropriation of similar character to that of subdivision 33 to be invalid as embracing general legislation. We reaffirm the principles of law stated in the Sellers case, but think they are not applicable to this case. In the former case section 6 of the General Appropriation Act of 1933 removed from the various state agencies the power which they had previously had of expending, according to their discretion, the funds appropriated for their use for operation and travel, and vested such power and discretion in the Governor. It also appropriated money for the salary of a secretary to the Governor to assist in the exercise of such discretion. We held that the provisions of section 6, which took away from the various agencies of government the discretion which they had previously had in expending appropriations made for them, and giving that discretion to some other agency of government, was legislation of a general character, and could not be included in the general appropriation act, and, since such provisions must fall, any appropriation made to aid in carrying out the invalid part of the act fell also.

But in subdivision 33, *supra,* there was no such attempt at general legislation. Bearing in mind the rules of statutory construction that we are to seek for the intent of the legislature and to give such interpretation to ambiguous language in a statute, if possible, as will render the act constitutional, we hold

that the true meaning of subdivision 33 is that the legislature has appropriated for that department of state controlled under the law by the chief executive the sum of $10,000, to be expended by him in his discretion in assisting the department controlled by the Attorney General in the handling of tax suits. He is not authorized to use the money in payment for legal services, for that matter is vested exclusively in the Attorney General by chapter 34, *supra,* and the costs of such services are provided for in the appropriation made for that office. The Governor may not compel the Attorney General to accept such assistance, for the exclusive right to conduct litigation on behalf of the state is given by general law to the latter. But he may, if requested by the Attorney General, use the appropriation for the costs of such matters properly connected with the litigation, other than legal services, as he thinks proper. Subdivision 33, thus interpreted, does not violate the constitutional provision above set forth. *State ex rel. Whittier* v. *Safford,* 28 N. M. 531, 214 Pac. 759. It is true that this appropriation will not be available until the 1st day of July, 1935. We are satisfied, however, that, if the Attorney General represents to the federal District Court the true situation and that such appropriation will be available on the 1st day of July for the purpose of securing evidence necessary in the defense of such litigation, that court will grant him such reasonable time after that date as may be necessary properly to prepare his case.

If all of the nearly $30,000 thus available for the conduct of the impending litigation is about to be exhausted after as careful and economical an expenditure thereof as is consistent with efficiency, there is no excuse for anyone to fear that the rights of the public will be endangered. Under the Constitution the Governor may, at any time and on the shortest

notice, convene that body to which the appropriating power has been confided by the people, to take such steps as may be necessary, paraphrasing the old Roman formula, "to see that the state takes no harm."

The alternative writ of *mandamus* heretofore issued is quashed.

McALISTER and ROSS, JJ., concur.